UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

LAWRENCE JANICK,

                  Petitioner,

      -vs-

SUPERINTENDENT, FRANKLIN
CORRECTIONAL FACILITY, and
COMMISSIONER, NEW YORK STATE
DEPARTMENT OF CORRECTIONAL
SERVICES,
                  Respondents.
_____

**DECISION AND ORDER**

No. 02-CV-6547

## INTRODUCTION

Lawrence Janick ("Janick" or "petitioner"), represented by counsel, filed this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his conviction following a guilty plea to charges of third degree and fourth degree grand larceny. The parties have consented to disposition of this matter by the undersigned pursuant to 28 U.S.C. § 636(b).

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Janick was indicted by a Monroe County Grand Jury on three counts of grand larceny in the third degree and four counts of grand larceny in the fourth degree. The charges stemmed from Janick's alleged participation, along with his wife, in the extortion scheme described below.

On September 11, 1998, Janick approached a man outside an adult book store in the City of Rochester and asked whether he was "looking for a date." The man inquired whether Janick was a police officer, and Janick assured him he was not. The two men then drove together to another location, whereupon Janick exposed his penis. As soon as the man touched it, Janick

announced that he worked for the local newspaper and was going to write an article about the incident. The man identified himself as a priest and pleaded with Janick not to publish the story. With the priest now in a state of panic, Janick mentioned that he knew of a priest in the Niagara Falls area who had been in a similar predicament, and had avoided disclosure by donating money to the newspaper's Lend-A-Hand fund. The priest immediately offered to do the same, and handed Janick the contents of his wallet–$80. Janick informed the priest that that was not enough money, and told the priest to meet him the following morning.

Over the next two months, the priest turned over more than $30,000 to Janick. In November 1998, Janick recruited his wife to help him extort more money from the priest; the priest ultimately gave her a total of $3,000.

The ruse came to an end in November of that year when the police were called to a motel in the City of Rochester to respond to an altercation between Janick and his wife, Kim Glascoe ("Glascoe"). The police discovered large sums of cash in the couple's room. Glascoe, who apparently was angry at her husband and wanted to get him into trouble, confessed to the police concerning where the money had come from. To verify her story, she called the extortion victim at his rectory and handed the phone to the police. The priest confirmed that he had made cash payments to Janick to avoid disclosure of something shameful he had done.

Janick and Glascoe then were arrested, and both gave statements to the police. Glascoe gave a full confession detailing the entire extortion scheme. Janick admitted that he took large sums of money from the priest on several occasions but denied ever threatening him. According to Janick, the priest gave the money to him voluntarily.

On May 20, 1999, shortly before his trial was scheduled to begin in New York State

Supreme Court (Monroe County) (Ark, J.), Janick agreed to plead guilty to the entire indictment and waive his appellate rights in return for a sentence promise of two to four years imprisonment. The written plea agreement provided that the court could sentence the defendant "[a]s it deem[ed] appropriate," should the defendant "[v]iolate the law" prior to sentencing. *People v. Janick*, 186 Misc.2d 1, 2, 713 N.Y.S.2d 838 (Sup. Ct. Monroe Co. 2000) (citing Plea Agreement and Colloquy, ¶4) ("Should I [v]iolate the law . . . between now and my sentencing, the court . . . [may enhance] . . ."). After Janick and his defense counsel filled out and signed the court's plea agreement and colloquy, counsel reiterated his understanding of that agreement:

> Judge, it's my understanding that if Mr. Janick was to plead guilty to all seven counts contained in the indictment . . . that he would receive a minimum sentence as a predicate felon of two to four years.
> I also asked the court whether Mr. Janick would be permitted to be released from custody at this point until the time of sentencing. My understanding [is] the court will allow that to occur, but will also advise Mr. Janick of any enhancement warnings, and those warnings would include that he *cannot be arrested for any violation of state, federal,* [or] *local law between the time of his release and the time of the sentencing*.
> . . .
> If he were to fail or violate any of those conditions the court has the opportunity to sentence him up to the maximum of this charge, if the charges were to be run consecutive[ly], which would be essentially a maximum of ten to twenty years."

P.3-4 (emphases supplied).[1] Defense counsel added, "If there is anything I've left out I'd ask the court to notify me." P.4. The court did not correct defense counsel.

The prosecutor then requested that the court advise Janick that "*no new crimes or arrests while he is out of custody should occur,*" and that "on violation or failure to comply with any one of those conditions, that the court has the right and in fact will enforce the promise it will make as to the maximum sentence." P.6 (emphasis supplied). Thereafter, the court engaged Janick in

---

[1] Citations to "P.__" refer to the plea transcript.

the following colloquy:

> The Court: . . . Do you understand everything that's been put on the record, Mr.
> Janick?
> Defendant: Yes, I do.
> The Court: Do you understand the conditions that have been set forth by the
> assistant district attorney?
> Defendant: Yes, I do.
> . . .
> The Court: Also do you understand that if you don't show up on July 13th, 1999 at
> 9:30 in the morning for sentencing, *or you get arrested between now and that*
> *time, or you violate any of the other terms and conditions that have been set forth*
> *by the two attorneys on today's date,* that you'll . . . serve a minimum of ten years,
> not to exceed twenty years in a state prison, do you understand that?
> Defendant: Yes, I do.

P.8-9 (emphasis supplied). The court then proceeded to take Janick's guilty plea. Pursuant

to the terms of the plea bargain, Janick was released from custody pending sentencing.

Prior to sentencing, on June 24, 1999, Janick was arrested and charged with extorting

money from another victim in a scheme similar to that used on the priest. Due to the possibility

that Janick had violated the "no arrest" provision of his plea agreement, making him subject to

receiving a sentence enhancement, the court held a hearing pursuant to *People v. Outley*, 80

N.Y.2d 702, 594 N.Y.S.2d (1993),[2] to determine whether there was a "legitimate basis" for

Janick's arrest. Dennis Barrett, the victim, testified at the hearing, along with Janick and the two

police officers who arrested him.

---

[2] In *Outley*, the New York Court of Appeals acknowledged that to comply with the constitutional guarantee
of due process, a sentencing court "must assure itself that the information upon which it bases the sentence is reliable
and accurate." 594 N.Y.S.2d 683 (citing *Mempa v. Rhay*, 389 U.S. 128, 133 (1967) and *Townsend v. Burke*, 334
U.S. 736, 741 (1948)). The defendants in *Outley* had all breached a "no arrest" condition by being arrested prior to
sentencing, but all denied complicity in the underlying crime. The Court of Appeals held that "proof that defendant
actually committed the post-plea offense which led to the arrest was not necessary" before the court could impose the
enhanced sentenced. However, it then had to decide what lesser showing was required by due process. The *Outley*
court concluded that the sentencing court "must conduct an  inquiry at which the defendant has an opportunity to
show that the arrest is without foundation," with the inquiry to "be of sufficient depth . . . so that the court can be
satisfied–not of defendant's guilty of the new criminal charge–but of the existence of a legitimate basis for the arrest
on that charge."

Barrett testified that he encountered Janick in Highland Park in the City of Rochester on June 2, 1999, at about 9 p.m. Janick asked him if he was "looking for a date," and Barrett responded affirmatively. The two then proceeded to .. and allowed Barrett to touch his penis. Once Barrett did so, Janick announced that he was a "parks patrol officer" and threatened to place Barrett under arrest. When Barrett begged to be let go, Janick said that arrest could be avoided if Barrett made a charitable contribution. Janick threatened Barrett that his name would appear in the newspaper if he were arrested. Because Barrett did not have any cash on him, he and Janick drove in Barrett's car to various ATMs in the City of Rochester, including one at Wegmans Supermarket on Mt. Hope Avenue. Spying a police car parked near the last ATM that they visited, Barrett jumped from the car and ran over to enlist the officer's assistance. By the time he returned with the police officer to his car, Janick was gone.

Barrett described the extortionist as a white male, with a beard and receding hairline. Although Janick did not have a beard at the time of the hearing, he is a white male who is partially bald. According to the six-foot tall victim, the extortionist appeared to be several inches shorter than he was. Barrett testified that Janick placed his hands and forearm on the car door while he smoked a cigarette.

The police testified that they found Janick's fingerprints on the exterior of the passenger-side door of Barrett's car near where the window goes into the door. H.47-48. When they took Janick in for questioning on June 24, 1999, Janick initially stated that he did not know Dennis Barrett and had not done anything wrong. Several minutes later, Janick offered to give a complete confession if the police would release him from custody that night so that he could attend his son's graduation. The police said that would not be possible. According to the police,

Janick then proceeded to relate that he had met Barrett in Highland Park and driven to Wegmans with him. However, Janick denied that he took any money from Barrett. The police testified that they arrested Janick later that night.

Janick testified in his own behalf at the hearing. He denied ever being in Highland Park on June 2, 1999, or knowing a man named Dennis Barrett. He claimed that he traveled from Buffalo to Rochester on the evening of June 2nd to drop off his son at his home on Monroe Avenue. Janick claimed that he was supposed to have attended a concert that night at Rochester's Frontier Field with his son and his wife, but that they did not do so because the weather was inclement. Janick testified that after dropping his son off, he visited two customers of his snack distributing business in downtown Rochester between 9:30 and 10:00 p.m. He claimed that he then drove back to Buffalo and returned to Rochester at about 2:30 a.m. in the morning of June 3rd to go to the emergency room at Highland Hospital to have X-rays taken of his back so that he could bring them to a doctor's appointment.  H.108-10.  Janick had no explanation for how his fingerprints came to be on the victim's car. Janick testified that he was six feet tall. He also contested Barrett's characterization of his hairline as "receding," stating that it had been "receded" for a "long time."

At the close of the proofs, the trial judge concluded that the evidence of Janick's fingerprints on the complainant's car and the complainant's description of the perpetrator "more than sufficiently establishe[d] a legitimate basis" for Janick's arrest. On August, 18, 1999, Janick was sentenced to an enhanced term of incarceration of seven and one-half to fifteen years, the sentencing court apparently having decided that the promised ten-year minimum to twenty-year maximum sentence was not warranted. In January 2000, a Monroe County Grand Jury heard

evidence concerning the June 24th charges and returned a "No True Bill." County Court thereafter sealed the file.

While his direct appeal was pending, Janick brought a motion in the trial court (New York State Supreme Court (Monroe County) (Fisher, J.)) pursuant to C.P.L. § 440.20 alleging that he received an enhanced sentence in violation of the terms of his plea agreement. In a thorough opinion entered September 11, 2000, Justice Fisher held that although the sentence enhancement condition was ambiguous and would be construed in petitioner's favor as a "no misconduct" agreement, the evidence established that petitioner most likely committed the offenses underlying his post-plea arrest. *People v. Janick*, 186 Misc.2d 1, 713 N.Y.S.2d 838 (Sup. Ct. Monroe Co. 2000). Therefore, the sentencing court properly considered that conduct in order to impose an enhanced sentence for petitioner's violation of the "no misconduct" condition of his plea agreement. *Id.*

When the Appellate Division, Fourth Department, of New York State Supreme Court disposed of Janick's direct appeal on November 9, 2001, it did not refer to Justice Fisher's opinion. *See People v. Janick*, 288 A.D.2d 885, 732 N.Y.S.2d 218 (App. Div. 4th Dept. 2001). Rather, the Appellate Division summarily found that "[a]s part of the plea agreement, defendant unequivocally agreed to a no-arrest condition." *Id.* Permission to appeal to the New York Court of Appeals was denied.

This federal habeas petition followed, in which Janick raises two ground for relief. First, he asserts that the plea agreement was ambiguous and that his right to due process was denied by the court's interpretation of it as a "no arrest" agreement rather than a "no misconduct" agreement. Second, Janick contends that his due process rights were violated by the court's

abrogation of the plea bargain on the basis the arrest that occurred prior to sentence was legally justified. *See* Petition at 6 (Docket #5). For the reasons set forth below, the petition is denied.

## DISCUSSION

### Standard of Review

Janick's habeas corpus petition is governed by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").[3] AEDPA's revisions to § 2554 greatly circumscribe a district court's authority to grant federal habeas relief. *See*, *e.g.*, Now, habeas relief is available to a state court petitioner only if the state criminal proceedings "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). In *Williams v. Taylor*, the Supreme Court construed this language as "refer[ing] to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." 529 U.S. 362, 411 (2000). With respect to the "unreasonable application of" clause, the Supreme Court somewhat tautologically instructed federal habeas courts to "ask whether the state court's application of clearly established federal law was *objectively unreasonable*." *Id.* at 409 (emphasis supplied). According to the Supreme Court, the "most important point" in such an analysis is that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Id.* at 410 (emphasis in original). The Second Circuit, in interpreting *Williams*, has explained that although "[s]ome increment of incorrectness beyond error is required . . . the increment need not be great; otherwise habeas relief would be limited to state court decisions so far off the mark as to suggest judicial

---

[3] Pub. L. No. 104-132, 110 Stat. 1218.

incompetence." *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000) (internal quotation marks and citations omitted).

## Merits of the Petition

Janick first contends that the plea agreement was ambiguous and that any ambiguities should be resolved in his favor pursuant to the doctrine of *contra proferentum*. He bases this claim upon the alleged disparity between the written "plea agreement and colloquy," P.4, which he signed, and the oral representations by defense counsel, the prosecutor, and the judge, which he said that he understood. *See* Memorandum in Support of Petition for Habeas Corpus ("Pet'r Mem.") at 2 (Docket #1).

### "No Arrest" or "No Misconduct" Provision

As Janick correctly notes, the decision to plead guilty involves the waiver of significant constitutional rights and "must be a voluntary and intelligent choice among the affirmative courses of action open to the defendant." *North Carolina v. Alford*, 400 U.S. 25, 21 (1970); *see also Brady v. United States*, 397 U.S. 742, 748 (1970); *accord*, *e.g.*, *Innes v. Dalsheim*, 864 F.2d 974, 977 (2d Cir. 1988). Janick contends that "[b]ecause the terms of a plea agreement are largely dictated by the state, and plea agreements implicate 'substantial constitutional interests,' any lack of clarity must be resolved in favor of the defendant." Pet'r Mem. at 3 (Docket #1). Therefore, Janick reasons, the plea bargain in his case "must be interpreted as including a condition that only petitioner's commission of a new crime, and not a mere legal arrest, would result in an enhanced sentence." *Id.* Stated another way, Janick's argument is that the enhanced sentence he received would have been justified only if the plea agreement unambiguously implied a "no arrest" condition–that is, if the sentencing court's interpretation of the

enhancement provision were the only reasonable interpretation.

Spence, which is factually similar to Janick's case to some degree, bears close examination. However, I must conclude that Spence, in the end, is distinguishable from the factual circumstances presented here. In Spence, the sentencing judge promised that if petitioner "'had no violations' and was 'not rearrested' and 'did not get into any other trouble,' that he (the judge) would look 'very favorably'" upon giving petitioner youthful offender status and giving him five years probation. But, the judge told Spence, "'[i]f you get rearrested, that's a *voluntary choice you made by going out and doing something which you should not have been doing. It rests solely with you.* If you get rearrested . . . I'm going to sentence you up to the maximum time allowed by law–again, it[']s eight and a third to 25.'" 219 F.3d at 167 (emphasis supplied).

The Second Circuit believed that the court's instruction to Spence was "ambiguous, and susceptible to two meanings: Spence would violate the terms of his probation simply by being rearrested; or, Spence woule violate probation only if he committed some wrongful act within his control." *Id.* That is to say, the Second Circuit continued, "the plea agreement could be understood either as a 'no arrest' or as a 'no misconduct' agreement." *Id.* Thus, the *Spence* panel disagreed with the district court and the state courts below, which had deemed the agreement to contain a "no arrest" condition. The Second Circuit stated, "We think it was a no misconduct agreement because we do not believe a youthful offender like Spence would understand that a 'no arrest' bargain as [the judge] explained it to him included an arrest in circumstances where he had committed absolutely no wrongful act[.]" *Id.*

The *Spence* court noted that the "most critical" part of the colloquy involved the judge's explanation of what it meant to be "rearrested": that it was a "*voluntary choice* [petitioner] made

-10-

by *going out and doing something which you should not have been doing*. It *rests solely* with [petitioner]." *Id.* at 168 (emphasis in original; alterations added). According to the Second Circuit, a defendant in petitioner Spence's position "relying solely on a judge's explanation, would understand the crucial term [*i.e.*, "rearrested"] to mean what the judge defined it to be: misconduct within the defendant's volition that would be a violation of the agreement." *Id.* Thus, the Second Circuit stated, the trial court "should have known that Spence would understand that if he did not do anything wrong, he would not be violating this condition." *Id.* The conclusion drawn by that court was that Spence's understanding had to prevail because he "had no reason" to attach any other meaning than that "apparent from the judge's own words," and the judge "had reason to know" the meaning that Spence would attach to the term "rearrested," in light of the definition given. *Id.*

Several factors persuade this Court that the plea agreement into which Janick entered, and the circumstances surrounding its execution, are distinguishable from *Spence*. First of all, the trial judge who took Janick's plea did not engage in a lengthy and detailed explanation of what the term "arrested" meant. In fact, the judge did not modify the term "arrested" in any way, and he certainly did not define "getting arrested" as something solely within Janick's control:

> The Court:    Also do you understand that if you don't show up on July 13th, 1999 at 9:30 in the morning for sentencing, *or you get arrested between now and that time, or you violate any of the other terms and conditions that have been set forth by the two attorneys on today's date*, that you'll . . . serve a minimum of ten years, not to exceed twenty years in a state prison, do you understand that?
>
> Defendant:    Yes, I do.

P.8-9 (emphasis supplied). Thus, as the judge explained the conditions to Janick, either getting arrested *or* violating any of the other conditions that were contemplated (i.e., committing new

crimes, which was mentioned by the prosecutor; or violating the law, which was stated in the written agreement), would result in a sentence enhancement.

Furthermore, Janick was not an inexperienced youthful offender as was petitioner Spence. At the time of his plea, Janick was a forty-year-old man. Based upon how he conducted himself at the *Outley* hearing, Janick clearly is of at least average intelligence; the trial court specifically observed that Janick was "well spoken." As noted above, the prosecutor, the trial judge, and defense counsel all stated that their understanding was that plea agreement included a "no arrest" condition. Janick was thoroughly questioned by the court and confirmed that he understood if he did not appear for the scheduled sentencing, "or [he got] arrested between now and that time, or [he] violate[d] any of the other terms and conditions that have been set forth by the two attorneys on today's date," he would be sentenced to a minimum of ten years imprisonment. Tellingly, Janick admitted at the *Outley* hearing that when he was brought in for questioning by the police in connection with the Barrett incident, he told them that he would face additional time on his prior conviction if he "got into an arrest *or* got into trouble." H.79, 140[4] (emphasis supplied). Even at sentencing, Janick did not profess to have misunderstood the terms of the plea bargain. Rather, he claimed (for the first and last time) that the plea was involuntarily made; he stated that he only entered into it because an anonymous telephone caller had promised him and his wife $20,000 apiece if he pleaded guilty and "kept his mouth shut." H.169-71. Finally, Janick was not a stranger to the criminal justice system, as evidenced by the fact that he was being sentenced as a predicate felon.

Under these circumstances, I do not believe that Janick reasonably would have

---

[4]  Citations to "H.___" refer to the transcript of the *Outley* hearing.

understood the rearrest provision "to cover only those acts over which he had control[.]" *Spence*, 219 F.3d at 168. Consequently, I cannot find that Janick was misled into assenting to the conditional plea bargain here at issue.

Furthermore, I see no reason why the plea agreement could not contain both a "no arrest" condition and a "no misconduct" or "no violation of the law" condition. The two certainly are not mutually exclusive. Contrary to Janick's contention, there was no need for the trial judge to explicitly repudiate the "no violation of the law" provision in the written plea agreement in order to also warn Janick not to commit any new crimes or get re-arrested. In fact, there is authority for the proposition that in New York State criminal practice, "no arrest" conditions, whether implicit or explicit, are considered to be part of conditional plea agreements. *Mask v. McGinnis*, 1999 WL 401668, at *4 (S.D.N.Y. June 17, 1999) (citing *People v. Coleman*, 621 N.Y.S.2d 578 (App. Div. 1st Dept. 1995); *People v. Ramirez*, 620 N.Y.S.2d 943 (App. Div. 1st Dept.1995)), *aff'd*, 252 F.3d 85 (2d Cir. 2001).[5]

---

[5] Even if the plea agreement were ambiguous in the manner suggested by Janick, there is no Supreme Court precedent to which petitioner has pointed or of which this Court is aware holding that "[f]ederal due process requires that all conditions placed on a sentence promised in a plea bargain be communicated to the defendant unambiguously." *Mask v. McGinnis*, 252 F.3d 85, 89-90 (2d Cir. 2001) (alteration in original). The Second Circuit stated that even if petitioner had accurately formulated *Innes*'s holding, he had "established, at most, that the state courts unreasonably applied clearly established *Second Circuit* precedent." 252 F.3d at 90 (emphasis in original). Under AEDPA, however, habeas relief is available "only upon a showing that the state courts unreasonably applied clearly established *Supreme Court* precedent." *Id.* (emphasis in original).

Assuming for argument's sake that the Supreme Court had adopted the aforementioned interpretation of *Innes*, I would not find that the Appellate Division unreasonably applied this holding because, as discussed above, I am not persuaded that Janick's reading of the plea agreement and plea colloquy is reasonable. In other words, I do not disagree with the state court's conclusion that Janick was sufficiently put on notice that he would be subject to a sentence enhancement if he were rearrested *or* he violated the law. Even if I did disagree with the state court's conclusion, I would not find that any such error rose to the requisite level of "'objective[ ] unreasonable[ness]'" so as to justify habeas relief. *Mask*, 252 F.3d at 91 (quoting *Williams v. Taylor*, 529 U.S. at 409  (alteration in original) and citing *Clark v. Stinson*, 214 F.3d 315, 322 (2d Cir. 2000) ("Because we do not find it obvious on this record that a constitutional violation occurred . . . under the federal . . . constitutional standard, we likewise find the decision of the New York Court to be a reasonable application of federal decisional law as set forth by the Supreme Court.")).

Having found that the Janick's plea agreement contained a "no arrest" provision, I turn to the question of whether "a showing that a post-plea arrest has a 'legitimate basis' as required by *Outley* accords a defendant sufficient due process." *Spence* 219 F.3d at 168. The Second Circuit specifically declined to address that issue in *Spence* because it found that the condition to which the petitioner in that case agreed specified "no misconduct" rather than "no arrest." *Id.*

**Due Process Sufficiency**

In disposing of Janick's direct appeal, the Appellate Division held that, based upon *People v. Outley*, the sentencing court "properly conducted an inquiry to allow [defendant] an opportunity to show that the arrest was without foundation[.]" *People v. Janick*, 288 A.D.2d 885, 732 N.Y.S.2d 618 (citing *Outley*, 80 N.Y.2d at 713). It further found in the record a "legitimate basis for the arrest." *Id.* (citing *Outley*, 80 N.Y.2d at 713). Thus, there are two components to the Appellate Division's holding–the first concerns the amount of process due to petitioner, and the second relates to the appropriate burden of proof.

Turning first to the extent of the post-arrest inquiry required, I note that in general, both state and federal sentencing courts are afforded wide latitude with respect to the information that they may consider in imposing criminal punishments. *United States v. Tucker*, 404 U.S. 443, 446, 92 S. Ct. 589, 591, 30 L. Ed.2d 592 (1972); *Williams v. New York*, 337 U.S. 241, 248, 69 S. Ct. 1079, 1083, 93 L .Ed. 1337 (1949). However, a sentencing court's discretion is circumscribed by the requirements of due process. *Gardner v. Florida,* 430 U.S. 349, 358, 97 S. Ct. 1197, 51 L. Ed.2d 393 (1977) ("[T]he sentencing process . . . must satisfy the requirements of the Due Process Clause."). In particular, a sentencing court will have violated constitutional guarantees of due process if a defendant is incarcerated on the basis of "misinformation" or statements that

-14-

are "materially untrue." *Townsend v. Burke*, 334 U.S. 736, 741, 68 S. Ct. 1252, 1255, 92 L. Ed. 1690 (1948); *accord United States v. Romano*, 825 F.2d 725, 728 (2d Cir.1987). Janick is therefore correct that a defendant does have "a due process right to question the procedure leading to the imposition of his sentence." *United States v. Pugliese*, 805 F.2d 1117, 1122 (2d Cir. 1986) (citing *Gardner v. Florida*, 430 U.S. at 358)).

The Second Circuit has explained that "[d]ue process requires that a defendant be given an opportunity to assure the accurate presentation of reliable sentencing information to the district court." However, the Second Circuit has clarified that a defendant is not entitled as of right to "a full-blown evidentiary hearing at sentencing." *See United States v. Romano*, 825 F.2d 725, 728 (2d Cir. 1987) (citing *United States v. Needles*, 472 F.2d 652, 657-58 (2d Cir. 1973)) (conceding that "material false assumptions as to any facts relevant to sentencing, renders the entire sentencing procedure invalid as a violation of due process," but holding that "[i]t does not follow . . . that an evidentiary hearing must be held whenever a defendant asserts the falsity of some statement in his pre-sentence report); *Romano*, 825 F.2d at 728-29 ("[W]hen a defendant challenges the veracity of hearsay evidence in a pre-sentence report the government is required to introduce corroborating proof to insure the reliability of the evidence.") (citing *Pugliese*, 805 F.2d at 1123 (citing and quoting *United States v. Fatico*, 579 F.2d 707 (2d Cir. 1978)); *accord People v. Outley,* 80 N.Y.2d at 712 (Where the prosecution does introduce information for the purpose of obtaining an enhanced sentence, due process requires that the court "assure itself that the information . . . is reliable and accurate.") (citing *Mempa v. Rhay*, 389 U.S. 128, 133 (1967)). It is clear that some process is due to a defendant who challenges information to be used against him in sentencing, but the Supreme Court has not specifically delineated the scope of the inquiry

a sentencing court must conduct.

In *People v. Outley*, the New York Court of Appeals was asked to consider the minimum due process required when a defendant has breached a "no arrest" condition by being arrested before sentencing but denies any complicity in the underlying crime. The *Outley* court specifically *rejected* the argument that when a defendant denies the post-plea criminal conduct, the court must conduct an evidentiary hearing to satisfy itself by a preponderance of the evidence that the defendant has, in fact, committed the crime for which he was arrested. *Outley*, 80 N.Y.2d at 712. The court observed that "[n]othing in the decisions" of either the the New York or Federal courts "call[ed] for such an onerous rule[.]" To impose such a requirement, in that court's opinion, would effectively change the condition of the plea bargain from not being arrested for a crime to not actually committing a crime. *Id.* at 712-13.[6] In other words, it would make a "no arrest" condition tantamount to a "no misconduct" condition. Consequently, the *Outley* court declined to adopt the preponderance-of-the-evidence standard. *Id.* at 712. The court also refused to require a "full blown" evidentiary hearing as to whether the defendant actually committed the crime, stating that the sentencing court need only conduct "an inquiry at which the defendant has an opportunity to show that the arrest [was] without foundation." *Id.* at 713. The inquiry was to be of "sufficient depth" that the sentencing court would be "satisfied" not of defendant's guilt of the new criminal charge but rather that there was the "existence of a legitimate basis for the arrest on that charge." *Id.*

---

[6] Because the defendants in Outley did not attack the legality of attaching a "no arrest" condition to a plea bargain, the court did not have to analyze whether such a provision was constitutional in the first instance. 80 N.Y.2d at 713. The *Outley* court noted that the procedure for attaching a "no arrest" condition to a plea bargain has been approved in New York and in courts of other jurisdictions. *Id.* (citing New York state cases and *Innes v. Dalsheim*, 680 F. Supp. 517, 519-20 (E.D.N.Y.), *rev'd on other grounds*, 864 F.2d 974 (2d Cir. 1988).

**Burden of Proof**

Supreme Court precedent does not shed much light on the minimum burden of proof that must be met in this type of sentencing situation. In *McMillan*, the state of Pennsylvania had deemed a particular fact (visible possession of a firearm) relevant to sentencing and had statutorily prescribed a particular burden of proof (a preponderance of the evidence). The petitioners argued that the due process clause required that visible possession be proved by *at least clear and convincing evidence* before their sentences could be enhanced. The Supreme Court cursorily expressed its disagreement: "Like the court below, we have little difficulty concluding that in this case the preponderance standard *satisfies* due process." That was the extent of the Supreme Court's analysis. In *Nichols*, the Supreme Court relied on *McMillan* to state in *dicta* that the petitioner, consistent with due process, "could have been sentenced more severely based simply on evidence of the underlying conduct that gave rise to the previous DUI offense[,]" and the state "need prove such conduct only by a preponderance of the evidence." 511 U.S. 738, 748 (citing *McMillan*, 477 U.S. at 91). Neither *McMillan* nor *Nichols* provides much guidance on this issue since both cases lack an analysis of what the proper burden of proof should be with respect to factual issues that are in contention at sentencing. Significantly, the Supreme Court observed in *McMillan* that "[s]entencing courts have traditionally heard evidence and found facts without any prescribed burden of proof at all." 477 U.S. at 91; *see also id.* at 92 n.8. Thus, a reasonable reading of *McMillan* is that preponderating evidence of disputed factual issues at sentencing is sufficient to comport with due process but is not a necessary condition. *E.g.*, *Coleman v. Rick*, 281 F. Supp.2d 549, 559-60 (E.D.N.Y. 2003).

In light of the foregoing, the Appellate Division's holding that Janick voluntarily and

-17-

knowingly agreed to a "no arrest" condition was not an objectively unreasonable interpretation of clearly established federal law as determined by the Supreme Court. Furthermore, the state court's holding that the evidence presented at the *Outley* hearing established that there was a "legitimate basis" for his post-plea re-arrest was sufficient to comply with the requirements of due process under the Supreme Court precedent discussed above. *See, e.g., Coleman v. Rick*, 281 F. Supp.2d at 549 (petitioner alleged that he was sentenced without the benefit of sufficient facts concerning his post-plea re-arrest; district court held, following a brief hearing at which petitioner was given the opportunity to speak (but was unsworn), that the state court's determination that there existed a legitimate basis for petitioner's arrest was, "under the circumstances of th[at] case, sufficient to accord with due process").

As District Judge Weinstein noted in *Coleman*, the recent Second Circuit decision in *Torres v. Berbary*, 340 F.3d 63 (2d Cir. 2003), casts some doubt upon this conclusion. Like Janick, the petitioner in *Torres* failed to meet a condition for lenient sentencing that had been imposed by the state sentencing court. Torres had been promised a sentence of "time served" in a drug rehabilitation treatment center upon successful completion of the program; if he did not complete the program, he faced a sentence of four and one-half to nine years in prison. Torres was dismissed from the program after the center's directors received reports that he was continuing to deal drugs from within the facility. The sentencing court, relying on a report from the program director that consisted solely of hearsay statements from other individuals in the drug treatment program, was convinced that Torres had violated the sentencing conditions. Therefore, the judge imposed the more stringent term of incarceration, holding that there was no reason to believe that the program directors did not have an "adequate basis" to believe the

hearsay statements concerning Torres. In addition, the district court in *Torres* found that the appellate division's holding, which relied upon *Outley* in concluding that the sentencing court had satisfied due process, was not contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court. The Second Circuit reversed the district court's decision in *Torres* and granted the writ.

The Second Circuit panel in *Torres* began by observing that the Supreme Court had clearly established that a "preponderance of the evidence" standard "satisfies" the constitutional requirements of due process. *Id.* at 68-69 (citing *McMillan*, 477 U.S. at 91 and *United States v. Watts*, 519 U.S. 148, 156 (1997) ("[W]e have held that application of the preponderance standard at sentencing generally satisfies due process.")). The Second Circuit then analogized re-sentencing after breach of a sentence condition to the revocation of parole, for which "'minimum requirements of due process must be followed.'" *Id.* at 69 (quoting *Morrissey*, 408 U.S. at 488). It is in the next part of the Second Circuit's analysis that, in this Court's opinion, some confusion arises. Without citation to any Supreme Court cases, the Second Circuit then announced that "[a]s has been demonstrated, due process in sentencing requires *at least* a showing by a preponderance of evidence to resolve disputed factual issues." *Id.* at 71 (emphasis added). With all due respect to the Second Circuit, I must agree with District Judge Weinstein's observation that this conclusion is "unfounded in the logic of the court's opinion, which takes a 'sufficient' condition (the preponderance standard satisfies due process) and treats it as a 'necessary' condition (due process requires at least a preponderance standard)." *Coleman*, 281 F. Supp.2d at 560. Furthermore, the *Torres* court's conclusion does not seem to be supported by Supreme Court precedent. To the contrary, as noted above, the Supreme Court has observed that

sentencing courts "have traditionally heard evidence and found facts without any prescribed burden of proof at all." *McMillan*, 477 U.S. at 91 (citing *Williams v. New York*, 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949)); *see also* 477 U.S. at 92 n.8. In fact, the *McMillan* court pointedly found no "warrant [for] constitutionalizing burdens of proof at sentencing" in that case. *Id.* Thus, this Court is unclear as to where the Second Circuit has derived its conclusion that disputed factual issues must be established by *at least* a preponderance of the evidence before a court may re-sentence a defendant following a breach of a sentencing condition.

The Second Circuit concluded that "well-settled and clearly established Supreme Court due process jurisprudence or, at the very least, a reasonable extension of it, mandates a finding of denial of due process in Torres' sentencing." *Id.* at 72. The Second Circuit appears to have been referring to *Morrissey v. Brewer* here; earlier in the opinion, the panel stated that "[w]hile *Morrissey* involves standards for parole revocation, it is not a great extension to apply its principles to the breach-of-condition-of-sentence case" before the court. 340 F.3d at 71. In *Morrissey*, the Supreme Court held that in the context of parole revocation, a parolee is entitled under the due process clause to an opportunity for a hearing at which the parolee is informed of the evidence against him and, among other things, is able to testify; present witnesses and evidence; and confront adverse witnesses. 408 U.S. at 488. This "informal" hearing "must be the basis for more than determining probable cause; it must lead to a final evaluation of any contested facts[.]" *Id.* (emphasis added). However, the Supreme Court did not elucidate what level of proof beyond probable cause was required in order to decide that the facts warranted parole revocation, and it never mentioned the preponderance-of-the-evidence standard whatsoever in the opinion.

What seemed to most trouble the Second Circuit in *Torres* was not the sentencing court's application of a particular evidentiary standard but rather the quality of the evidence it relied upon in order to enhance the petitioner's sentence, namely, "a single report replete with multiple levels of hearsay and speculation[.]" *Torres*, 340 F.3d at 71. The Second Circuit took issue with the district court's opinion that "there was no reason to believe" that the rehabilitation center did "not have an adequate basis to believe" the informants' statements because there was "no explanation of the basis for the beliefs of [the center] other than vague references to information furnished by informants." *Id.* The Second Circuit pointed out that these informants might have had "axes to grind" against Torres or might have been promised rewards for information. Moreover, the Second Circuit found that the so-called "hearing" that Torres received did not even include his own sworn testimony, and therefore he was unavailable to be cross-examined regarding his contentions that he was discharged from the program merely for associating with certain inmates during "cigarette breaks." *Id.*

The Second Circuit noted several factors "unique" to Torres' case that "compel[led]" the issuance of the writ: "total reliance by the trial court on a hearsay report that itself contains only uncorroborated statements of unnamed informants; omission of any finding by the trial court as to the reliability of the informants or as to reasons for non-disclosure of their identities; failure of the trial court to conduct some kind of hearing, including provision for the examination of Torres under oath; lack of preponderating evidence of Torres' wrongdoing; and the gross disparity between a sentence that would release Torres to society on a plea to a misdemeanor charge after completion of the [drug treatment] program and the four-and-a-half-to-nine-year felony sentence to state prison that he received for violating the original sentence condition."

-21-

In contrast to the situation in *Torres*, Janick had more than a full-blown evidentiary hearing to determine whether he had violated the "no arrest condition" of the plea agreement–the prosecution essentially conducted a "mini-trial" of its case against Janick with respect to the charges underlying the new arrest. Notably, all witnesses testified under oath. First, the complainant testified without significant impeachment regarding his recollections of the incident with Janick in Highland Park. The complainant testified that Janick sat in the passenger side of his car and touched the car door in several places when they drove to Wegmans to use an ATM. Although he could not identify Janick from a photographic array, his description of the man who attempted to extort money from him was very close to Janick's appearance. Two police officers testified that Janick admitted during questioning that he met the complainant in the park and drove Wegmans with him. The officers also presented physical evidence that fingerprints were found on the complainant's passenger-side car door. In addition, there was expert testimony concerning the lifting of the prints and the fingerprint analysis, which established that the prints belonged to Janick.  Janick testified in his own behalf and presented documentary evidence in the form of telephone records in an attempt to establish an alibi defense. He denied knowing the victim and was cross-examined by the prosecutor. Justice Ark, after hearing all of the evidence, held that the testimony of the complainant as corroborated by the finding of defendant's fingerprints on his vehicles "more than sufficiently establishe[d] a legitimate basis for [Janick's] arrest." H.161.

In this Court's opinion, the *Outley* hearing conducted by Justice Ark in Janick's case was free from the procedural deficiencies that plagued the state court sentencing "hearing" in *Torres* and subsequently compelled the Second Circuit to grant petitioner's application for a writ in that

matter. However, in light of *Torres*, the issue that remains is whether the *Outley* "legitimate basis" standard is adequate to satisfy due process requirements at sentencing, or whether a "preponderance" standard is constitutionally required.

Even under the preponderance standard set forth in *Torres*, this Court would not be inclined to grant habeas relief on Janick's claim. Justice Fisher, the trial court judge who reviewed Janick's motion to set aside the sentence under C.P.L. § 440.20, held that the record established that not only was there a "legitimate basis" for the arrest, but that there was "preponderant evidence of guilt on the underlying charge," and even "clear and convincing evidence of guilt." *People v. Janick*, 186 Misc.2d at 6, 713 N.Y.S.2d at 842. Normally, that factual determination would be entitled to deference pursuant to 28 U.S.C. § 2254(e)(1), and Janick would have to overcome the presumption of correctness by "clear and convincing evidence," *id.* Janick argues, however, that this Court is precluded by Section 21 of New York's Judiciary Law from relying on Justice Fisher's holding because he was not present to hear any of the testimony provided at the *Outley* hearing, having succeeded Justice Ark on the bench after the hearing's conclusion.

Section 21 of the Judiciary Law provides that, except in an appellate court, a judge "shall not decide or take part in the decision of a question, which was argued orally in the court, when he was not present and sitting therein as a judge." It has been held that the "[t]he jurisdictional policy of requiring the Judge to hear the argument of a motion to qualify him to make the order would certainly seem *a fortiori* to apply to the hearing of evidence." *Michel v. Michel*, 31 A.D.2d 313, 315-16, 297 N.Y.S.2d 250 (App. Div. 4th Dept. 1969); *accord People v. Thompson*,158 Misc.2d 397, 601 N.Y.S.2d 418 (Sup. Ct. Queens Co. 1993). As interpreted, Section 21 has been

applied in criminal cases to prohibit the substitution of judges at hearings where testimony is

presented, not to a jury, but to the court, and the substituted judge is called upon to render a

decision based upon an evaluation of testimony which he or she did not hear. *Thompson*, 158

Misc.2d at 406-07 (citing *People v. Cameron*, 194 A.D.2d, 599 N.Y.S.2d 256 (App. Div. 1st

Dept. 1993) (suppression hearing); *People v. Hooper*, 22 A.D.2d 1006, 254 N.Y.S.2d 751 (App.

Div. 4th Dept. 1964) (*coram nobis* hearing to determine effectiveness of appellate counsel's

representation)).

Janick therefore is correct in his assertion. Nevertheless, this does not change the

outcome of his case.  Without conceding that a preponderance standard is required, I note that the

preponderance-of-the-evidence standard only requires a factfinder to decide whether a disputed

matter is more likely true than not true. *Spence v. Superintendent*, 987 F. Supp. 151, 164

(E.D.N.Y. 1997) (citing *United States v. Rosa*, 17 F.3d 1531, 1542 (2d Cir.), *cert. denied*, 513

U.S. 879 (1994)). The facts as found at the *Outley* hearing were that the police discovered

Janick's fingerprints on the complainant's car door. However, Janick denied ever meeting the

complainant and had no explanation as to how his fingerprints could have come to be there. This

denial, matched against the unchallenged fingerprint evidence at the *Outley* hearing, presented

ample evidence of petitioner's consciousness of guilt from which it can be logically inferred that

he committed the offense. While the judge at the *Outley* hearing made no specific finding that the

evidence of Janick's complicity in the incident which led to his rearrest preponderated, it is

beyond question that it did.  There is no point in upsetting Janick's conviction for purely

academic reasons. Relief on Janick's first claim is therefore denied.

As his second ground for habeas relief, Janick argues that "[i]mposing and enforcing as

part of a plea bargain the condition that the defendant not be rearrested results, as in this case, in

a defendant being penalized even where he has committed no wrong, as long as a police officer

has probable cause to believe that the defendant may have committed a crime." Pet'r Mem. at 5

(Docket #1). Janick claims that this violated his due process rights. *Id.*

       Janick relies on the district court's opinion in *Innes v. Dalsheim* to support the

proposition that due process requires "some knowing action by the defendant" before he can be

found to have breached a "no arrest" condition of a plea agreement. *See Innes*, 680 F. Supp. at

519 (citing *Oregon v. Kennedy*, 456 U.S. 667, 673-74 (1982) (holding that double jeopardy

clause prohibits re-trial of defendant after mistrial intentionally provoked by government)). It is

somewhat of a stretch to contend, as Janick does, that this statement by the district court in *Innes*

means that "it [is] not enough that the defendant was legally arrested." Pet'r Mem. at 6 (Docket

#1). On the authority of the "knowing action" statement by the district court in *Innes*, Janick

argues that the "legitimate basis" as formulated by the New York Court of Appeals in *People v.*

*Outley* violates the due process clause. In other words, Janick argues, unless a defendant

"voluntarily acts in a way that breaches the [plea] agreement," due process forbids the imposition

of an enhanced sentence.

       Even if Janick were correct, the Second Circuit did not address the issue when *Innes* was

appealed and issued no holding in that regard. Thus, the "knowing action" statement in the

district court's opinion in *Innes* is not binding precedential authority on this Court. Moreover, in

the post-AEDPA world the issue is whether clearly established Supreme Court precedent holds

that some "knowing action" is required in order to enhance a defendant's sentence based upon a

violation of a "no arrest" condition violates the Due Process Clause of the Fourteenth

Amendment. As discussed above, to this Court's knowledge, neither the Supreme Court nor the Second Circuit has ever so held. Habeas relief on this claim therefore is denied.

## CONCLUSION

For the reasons stated above, Lawrence Janick's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied, and the petition is dismissed.  In light of the decision of the Second Circuit Court of Appeals in *Torres v. Berbary*, 340 F.3d 63 (2d Cir. 2003), I grant Janick a certificate of appealability on his claim that his plea agreement was ambiguous and should have been construed as a "no misconduct" agreement and on his claim that, having found that his plea agreement contained a "no arrest" provision, the court erred in applying only the "legitimate basis" standard of proof.

**IT IS SO ORDERED**

/s/ *Victor E. Bianchini*

_____

VICTOR E. BIANCHINI
United States Magistrate Judge

DATED:      December 8, 2005
                    Rochester, New York.

-26-